Filed 9/21/16  In re Ca.R. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re Ca.R. et al., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B268396 (Super. Ct. Nos. J069259, J069260) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> Y.V. et al., <br><br> Defendants and Appellants. | |

Y.V. (mother) and C.R. (father) appeal the juvenile court's orders denying their modification petition and terminating parental rights to their minor children Ca.R. and Ci.R. with adoption as the permanent plan (Welf. & Inst. Code,[1] §§ 366.26, 388). Appellants contend the court erred in denying their modification petition and in finding that the beneficial parental relationship and sibling relationship exceptions to adoption (§ 366.26, subd. (c)(1)(B)(i) & (v)) did not apply.  Appellants further contend the court erred in concluding that Ca.R. and Ci.R.'s trial counsel, who also represented appellants'

---

[1] All statutory references are to the Welfare and Institutions Code.

minor child A.R. in a separate dependency proceeding, did not have a conflict of interest in representing all three children.  We affirm.[2]

FACTS AND PROCEDURAL HISTORY

*Detention, Jurisdiction/ Disposition, and 6- and 12-Month Review*

Ci.R. was born in March 2012, and Ca.R. was born in March 2013.  Three days after Ca.R.'s birth, HSA filed dependency petitions as to both children alleging that mother and Ca.R. tested positive for methamphetamine at the time of Ca.R.'s birth.  Appellants also had histories of substance abuse and father had prior convictions for using drugs and engaging in acts of violence.

Ca.R. and Ci.R. were placed together in a foster home and attorney Mandee Sanderson was appointed to represent them.  The court sustained the allegations in the petitions and granted appellants reunification services and visitation.  At the conclusion of the six-month review hearing, services were continued for six months.  HSA was granted discretion to liberalize visitation to overnight and weekends and extended periods not to exceed 60 days.

A.R. was born in February 2014 and was taken into custody pursuant to a section 300 petition.  He was placed with his siblings in foster care and Sanderson was appointed to represent him.  In May 2014, all three children were placed with the prospective adoptive parents.

At the contested 12-month review hearing, HSA and Sanderson recommended that services be terminated as to Ca.R. and Ci.R. and that the matter be set for a section 366.26 hearing with a permanent plan of adoption.  HSA reported that the children's 60-day visit with appellants had been terminated 30 days early after it was discovered they were living in unsanitary conditions and that appellants had

---

[2] The Ventura County Human Services Agency (HSA) recommended a permanent plan of long-term foster care for Ca.R. and Ci.R.  Because HSA disagreed with the court's decision to terminate parental rights, it declined to file a respondent's brief in this appeal.  Pursuant to the recommendation of Ca.R. and Ci.R.'s trial attorney, we appointed counsel to represent them on appeal.  (Cal. Rules of Court, rule 5.661(c).)

misrepresented the extent of their participation in their case plans. The court nevertheless granted an additional six months of services as to Ca.R. and Ci.R and granted six months of services as to A.R.

*18-Month Review, Termination of Services, and Setting of Section 366.26 Hearing*

In its 18-month report, HSA again recommended that services be terminated as to Ca.R. and Ci.R. and that the matter be set for a section 366.26 hearing with a permanent plan of adoption. HSA reported that father had been discharged from therapeutic services due to several absences and his failure to benefit from the sessions he attended. He had also missed half of his random drug tests and appellants had yet to obtain suitable housing.

At the contested 18-month review hearing, HSA reported that appellants had recently obtained housing for the children. Although HSA still recommended that services be terminated as to Ca.R. and Ci.R., it also "request[ed] the discretion to liberalize visitation to unsupervised, overnights, and weekends." HSA referred to "the importance of keeping siblings together" and offered "[i]f the parents are given an opportunity have six more months of Family Reunification Services with the youngest sibling, [A.R.], then it will allow them to complete the rest of their case plan services. It will also provide them an opportunity to have their visitation liberalized with [A.R.] The plan would be for [HSA] to be able to liberalize [Ci.R.] and [Ca.R.'s] visitation up to weekend visits. . . . If the parents continue to make progress in the case plan services while meeting the needs of the children, then in approximately two months, a 388 can be filed to request to have the parents' services reinstated and to potentially begin an extended 60-day visit . . . [to] coincide with [A.R.'s] extended visit. If the 60 days visit is deemed as successful then [HSA] will recommend the parents receive Family Maintenance services for all three children."

At the conclusion of the hearing, the court terminated services as to Ca.R. and Ci.R. and set the matter for a section 366.26 hearing. HSA's request for liberalized visitation was denied and single weekly overnight visits as previously ordered were

continued. Appellants did not seek writ relief from the court's order. An additional six months of services were offered as to A.R.

*Dr. Kwan's Bonding Study*

Pursuant to HSA's request, the court appointed psychologist Heidi Y. Kwan to conduct a bonding study and continued the section 366.26 hearing for 90 days. Dr. Kwan reviewed the records, interviewed appellants and the prospective adoptive parents, and conducted a telephone interview with Ci.R.'s therapist. She also observed Ca.R. and Ci.R.'s interactions with appellants and the prospective adoptive parents on two occasions each and conducted a "play session" with Ci.R. The doctor concluded that although Ca.R. and Ci.R. were attached to both appellants and the prospective adoptive parents, "the children, particularly [Ca.R.], appear to have a higher degree of attachment to their [prospective adoptive] parents than to [appellants] at this time . . . ."

Dr. Kwan deemed it "difficult" to address whether Ca.R. and Ci.R. would be "greatly harmed if parental rights were terminated" and whether the benefits of maintaining the parental relationship outweighed the benefits of adoption. Although the children would "continue to form stronger attachments with the parental figures no matter whom they will be with permanently" and "would experience a sense of loss" regardless of the permanent plan, the doctor found it determinative that "[i]n addition to the children's emotional attachment to [appellants], both [mother and father] have completed their mandated services, and reportedly attend NA meetings regularly to maintain their sobriety. They have also maintained full-time employment, and secured housing in the recent past. These factors suggest their motivation to regain custody of their children. Therefore, it is not recommended that their parental rights be terminated at this time." The doctor also opined that "both children, particularly [Ci.R.], seem to have formed a significant attachment to their brother, [A.R.], who currently is residing with [appellants]. Both [Ci.R.] and [Ca.R.] would experience additional loss if they separate from their brother, in the event of their adoption by their [prospective adoptive] parents." Dr. Kwan recommended that any return to appellants happen "gradually," that the children "receive

4

therapy to address the issue of loss and separation from their [prospective adoptive] parents," and that both mother and father maintain their sobriety.

*Sanderson's Alleged Conflict of Interest*

In May 2015, appellants' attorneys alleged that Sanderson had a conflict of interest due to her representation of all three children. At a June 2015 hearing on the matter, Sanderson expressed her belief that there was no such conflict. HSA's counsel argued that Sanderson merely had a potential conflict of interest rather than an actual conflict. The court asked Sanderson if her recommendation that Ca.R. and Ci.R. be freed for adoption created a conflict of interest in her representation of all three children. Sanderson replied that she was recommending termination parental rights as to A.R. as well, not merely Ca.R. and Ci.R. At a continued hearing, the court found that Sanderson did not have a conflict of interest.

*The Section 366.26 Hearing and Appellants' Section 388 Petition*

In a May 2015 memorandum, HSA recommended that "the permanent plan for the children be changed to Long Term Foster Care, that [HSA] be granted discretion to continue liberalizing visits between [the] children and [appellants], and that a 90 day Interim hearing be set to determine the appropriateness of granting family maintenance orders to [appellants]." The contested section 366.26 hearing began on June 24, 2015, and was continued for further hearing. The court also ordered a referral for an open adoption mediation.

On August 17, 2015, appellants filed a section 388 petition requesting that Ca.R. and Ci.R. be returned to appellants with family maintenance services. Appellants alternatively asked the court to order a permanent plan of long-term foster care and grant liberal visitation as advocated by HSA. Appellants offered that they had "participated in, completed and benefitted from" their case plan as to A.R., who had been living with them for almost five months.[3] Father also offered, "I am sober and continue to comply with

---

**3** Although A.R. began what was supposed to be a 60-day visit with appellants on March 20, 2015, he ended up staying with them indefinitely.

5

the testing component of my case plan." As to A.R., appellants filed a section 388 petition requesting a home-of-parent order with family maintenance services. The court found a prima facie showing had been made as to that petition, set the matter for hearing, and ordered that A.R. not be removed from appellants absent a warrant or exigent circumstances.

HSA contended that no prima facie showing had been made to support return of Ca.R. and Ci.R. to appellants as asserted in their section 388 petition. HSA submitted on appellants' alternative request for long-term foster care. Sanderson asserted that no prima facie showing had been made as to either request. The court ordered that a hearing on the petition be held in conjunction with the continued section 366.26 hearing.

Prior to the continued hearing, HSA reported that father had recently been arrested for being under the influence of drugs.[4] Although HSA found this "deeply concerning," it was "reluctant to recommend something as permanent as terminating parental rights for the parents when there is still a chance that some mistake was made." After the lab results came back positive, father continued to deny he had taken drugs and claimed the results were erroneous. HSA also discovered that father had four pending criminal matters and had missed another drug test.

At the continued section 366.26 hearing, Dr. Kwan testified that father's recent drug use and arrest "is a concern based on what I mentioned and based on what I said in [my] report." When asked if it affected her conclusions, she replied, "I cannot make any recommendations regarding the outcome of the children's custody, because . . . there's [sic] so many factors involved." When asked to identify the benefits of

---

**4** During a court appearance on a prior arrest, the courtroom deputy observed father exhibiting symptoms of drug use. Father admitted to the deputy that he had eaten a marijuana cookie earlier that day and taken a four-milligram dose of the opiate drug Dilaudid. A dipstick test of father's urine was positive for THC (the active ingredient in marijuana) and opiates. Father's urine sample was sent to the lab for full testing. He denied to the social worker that he had used drugs or admitted doing so and claimed "the lab results will prove" the dipstick test was a "mistake."

reunification versus adoption, she said, "it is not really my role to make that recommendations [*sic*]. It's really the Court's decision . . . ."

At the conclusion of the hearing, HSA reiterated its recommendation of long-term foster care for Ca.R. and Ci.R. and asked the court to liberalize visitation so the children could begin an extended visit with appellants. HSA also requested a 90-day review "to come back . . . and see if the visit was successful and could go to family maintenance." HSA recommended a home-of-parent order as to A.R., who had been living with appellants for over six months.

Sanderson recommended that appellants' section 388 petition as to Ca.R. and Ci.R. be denied and that parental rights be terminated as to both children with a permanent plan of adoption. Sanderson also recommended that reunification services be terminated as to A.R, whose dependency had reached the 18-month review period, and that the matter be set for a section 366.26 hearing. Sanderson acknowledged that the latter recommendation was "not a very strong position, but I think a 60-day visit should not go into . . . family maintenance and [A.R.] should be returned to the [prospective adoptive parents]." Sanderson later stated that "because of [HSA's] actions in moving . . . [A.R.] too quickly [into] the parents' home," it was apparent that "family maintenance exists at this point regarding [A.R.]" Although she would have "liked to argue them as a sibling group," HSA's actions precluded her from doing so. Sanderson also argued that the benefits Ca.R. and Ci.R. would obtain through adoption outweighed the detriment they would suffer if their relationships with appellants and A.R. were terminated. She offered, "they shouldn't be bounced around anymore. And what the parents want to do and what [HSA] is proposing to the Court is going to be just that: bouncing them around."

After taking the matter under submission, the court denied appellants' section 388 motion, terminated parental rights as to Ca.R. and Ci.R., and selected adoption as the permanent plan. The court found by clear and convincing evidence that the children were likely to be adopted and that none of the exceptions to adoption had

7

been established.  Appellants were granted a farewell visit.  A.R. was placed in appellants' custody under family maintenance services.

## DISCUSSION

### *Appellants' Section 388 Petition*

Appellants[5] contend the court abused its discretion in denying their section 388 modification petition, which requested that Ca.R. and Ci.R. be returned to them with family maintenance services or placed in long-term foster care.  We disagree.

The grant or denial of a section 388 petition is committed to the sound discretion of the trial court and will not be disturbed unless abuse of discretion is clearly established.  (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)  "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point, 'the focus shifts to the needs of the child for permanency and stability' [citation] . . . ."  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  To prevail on a section 388 petition, the parent bears the burden of proving by a preponderance of the evidence (1) that new or changed circumstances exist; and (2) that the proposed order would promote the best interests of the child.  (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1089; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 641-642.)  "The denial of a section 388 motion rarely merits reversal as an abuse of discretion. [Citation.]"  (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

The court did not abuse its discretion in denying appellants' section 388 petition.  Although the court found circumstances had changed to the extent appellants "appear to have made some changes that have stuck" and "have a stable home," circumstances had not changed in one very significant respect.  Appellants' drug use was the primary reason for the children's removal.  Not long after appellants filed their section 388 petition, father was arrested for being under the influence of drugs.  HSA chose to characterize father's drug use as a mere one-time "relapse," but his continued

---

**5** Although appellants make the same claims, their arguments are not identical. For ease of reference, we treat each argument as if it were raised by both parties.

8

refusal to acknowledge the incident raises serious concerns regarding his commitment to sobriety. The court reasoned that "although the parents . . . appear to be doing better, we have what I find an unexplained and, frankly, not credible explanation for a positive drug test by the father. [¶] So I just don't think returning now would be in the best interest of the children, and I don't think long-term foster care would be in the best interest of these children. Both of them—well, at least the latter would certainly create instability. And the former, I don't think . . . the parents are ready yet."

Appellants downplay the significance of father's recent drug use and his refusal to acknowledge it. They also fault the court for focusing on Ca.R. and Ci.R.'s need for permanence and stability to the detriment of their interest in family reunification. Appellants' cited cases make clear, however, that the children's need for permanence and stability became the paramount consideration after reunification services were terminated. (See, e.g., *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 ["Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability"]; *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1083 [same].) Contrary to appellants' claim, the court did not "engage[] in an exercise of weighing which were the preferable caretakers." Instead, it reasonably found that appellants had failed to meet their burden of demonstrating they are currently capable of providing permanency and stability to these children.

We reject appellants' assertion that the court's finding regarding A.R. is inconsistent with its findings regarding Ca.R. and Ci.R. Reunification was still the goal for A.R., while the primary concern of Ca.R. and Ci.R. was their need for stability and permanence. In light of father's unacknowledged relapse, the court did not abuse its discretion in finding that Ca.R. and Ci.R.'s best interests would not be served by returning them to appellants or placing them in long-term foster care.**6**

---

**6** Appellants assert that because "the juvenile court apparently relied upon a clear and convincing legal standard when reviewing the section 388 petition for [A.R.], it cannot be presumed" the court applied the correct burden of proof (i.e., preponderance of the evidence) in ruling on the section 388 petition as to Ca.R. and Ci.R. We can infer,

9

Mother also complains that "[t]he court failed to recognize the extent of Mother's changes independently from Father, and the significance those changes had on the question of stability for the children if they were returned to her care." It was made clear to mother and her counsel, however, that mother and father were being treated as "a package deal" for purposes of the section 388 petition. In arguing against the petition, Sanderson also asserted that appellants should be treated as a couple rather than individuals because they lived together as a couple. Mother did not object or inform the court that she was prepared to separate from father if necessary to preserve her parental rights to the children. Although two years earlier she told a social worker "I'll do it on my own," her subsequent actions indicated otherwise. Mother thus cannot be heard to now complain for the first time on appeal that the court treated her and father as a couple in adjudicating their section 388 petition.

*Beneficial Parental Relationship Exception (§ 366.26, subd. (c)(1)(B)(i))*

Appellants contend the court erred in finding that the beneficial parental relationship exception to adoption did not apply. We conclude otherwise.

"At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include adoption. [Citations.] 'If the dependent child is adoptable, there is strong preference for adoption over the alternative permanency plans.' [Citations.] In order to avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. [Citations.] The court, 'in *exceptional circumstances*,' may 'choose an option other than the norm, which remains adoption.' [Citation.] The parental benefit exception applies when there is a compelling reason that the termination of parental rights would be detrimental to the child. This

---

however, that the court's reference to "clear and convincing evidence" related to the assertion of HSA's counsel that "HSA would need a warrant, exigency or consent to detain [A.R.] from his parents' care, and they would need to show clear and convincing evidence to keep him removed from parental care."

10

exception can only be found when the parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 394-395.) "We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child. [Citations.]" (*Id.* at p. 395.)

It is undisputed that appellants maintained visitation with Ca.R. and Ci.R. and that the children were attached to them. The court did not abuse its discretion, however, in finding that appellants had failed to meet their burden of proving the children would benefit from continuing the relationship, i.e., that "the relationship promotes the well-being of the child[ren] to such a degree as to outweigh the well-being the child[ren] would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) In making this determination, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child[ren] of a substantial, positive emotional attachment such that the child[ren] would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

Father's recent drug use supports the conclusion that the beneficial parental relationship exception to adoption did not apply. (See *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1304 ["drug abuse is evidence continuing the parent-child relationship would not be *beneficial*"].) The court also properly considered the children's young ages and the fact they had spent the majority of their lives out of appellants' custody in concluding the children would not be greatly harmed if parental rights were terminated. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.)

Appellants point to Dr. Kwan's bonding study report and HSA's adoption of the doctor's conclusions as virtually irrefutable evidence that Ca.R. and Ci.R. would be greatly harmed if their relationships with appellants are terminated. Dr. Kwan's

conclusions, however, were based on circumstances as they existed in May 2015. When she testified in October 2015, she effectively withdrew her prior opinions and offered it was "not really [her] role" to recommend whether the benefits of reunifying outweighed the benefits of adoption. Moreover, the doctor's initial recommendation erroneously deemed it determinative that appellants had demonstrated "their motivation to regain custody of the children." "By the time of the section 366.26 hearing, family preservation is not an object of the statutory scheme. Family preservation is of critical importance from the time the minor is removed from parental custody (§ 202, subd. (a)) through the reunification period. However, when reunification efforts cease, the scale tips away from the parent's interest in maintaining family ties and towards the child's interest in permanence and stability. [Citation.] At that point, adoption becomes the preferred permanent plan. [Citations.]" (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344.)[7]

Other aspects of Dr. Kwan's report support a finding that Ca.R. and Ci.R. would *not* be greatly harmed if parental rights were terminated. She concluded the children were more attached to the prospective adoptive parents and that "the issues of loss and abandonment," which would arise if parental rights were terminated, could be addressed in therapy. She also recognized the children "have good capacity for attachment to parental figures" and "will continue to form stronger attachments with the parental figures no matter whom they will be with permanently."

Appellants cite several cases in support of their position that the beneficial parental relationship exception applied here. Suffice to say that the cases are inapposite. Appellants "are essentially asking us to reweigh the evidence and to substitute [our] judgment for that of the trial court." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51-52.) The question is not whether the court *could* have found that the beneficial parental

---

[7] Dr. Kwan's report also gives short shrift to the substantial benefits Ca.R. and Ci.R. will derive from adoption, most notably permanence and stability. Other than noting "there are many" such benefits, the doctor merely offered that the prospective adoptive parents "are likely to provide the children more resources than the birth parents can, based on their socio-economic status" and concludes "one cannot decide on the children's home placement based on financial resources only."

12

relationship exception to adoption applied, but rather whether it abused its discretion in finding otherwise. This simply is not the kind of "extraordinary case" in which "preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

*Sibling Relationship Exception (§ 366.26, subd. (c)(1)(B)(v))*

Appellants claim the court erred in failing to find that the termination of their parental rights as to Ca.R. and Ci.R. was precluded by the sibling relationship exception set forth in subdivision (c)(1)(B)(v) of section 366.26. We disagree.

Section 366.26, subdivision (c)(1)(B)(v) provides an exception to the preference for adoption when the juvenile court finds termination of parental rights would be detrimental to the child because "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 54 (*Celine R.*).) "Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citations.]" (*Id.* at p. 61.)

Establishing the sibling relationship exception would have required appellants to show that Ca.R. and Ci.R. had a significant relationship with A.R., that ongoing contact with A.R. was in their best interests, that termination of that contact would be detrimental, and that such detriment would outweigh the benefits of adoption. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951.) No such showing was made here. Although the court believed it had to assume there would be no further contact between

13

the siblings if Ca.R. and Ci.R. were freed for adoption, it was appropriate to consider the prospective adoptive parents' willingness to maintain the sibling relationship. Where evidence exists that sibling contact will continue after termination of parental rights, the court may consider this in determining whether parental termination would substantially interfere with the sibling relationship and whether such interference would outweigh the benefits of adoption. (See, e.g., *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014; *In re Megan S.* (2002) 104 Cal.App.4th 247, 254.) As of the section 366.26 hearing, appellants and the prospective adoptive parents were working with an open adoption mediator. According to the mediator, both parties had expressed their willingness to develop a plan that allows the children to maintain contact with each other.

In any event, the court did not abuse its discretion in finding that maintaining Ca.R. and Ci.R.'s relationship with A.R. outweighed the benefits of adoption. Although the children are bonded and shared some common experiences, they are very young. At the time of the section 366.26 hearing, Ci.R. had yet to reach the age of four and Ca.R. was two-and-a-half years old. A.R. was about twenty months old and had been living with appellants for over seven months. During that period, Ca.R. and Ci.R. only spent one night a week with him. Although the children lived together for the first year of A.R.s life, Ca.R. was less than a year old when A.R. was born and Ci.R. was younger than two. Moreover, Dr. Kwan expressed no opinion whether the sibling relationship was strong enough to outweigh the benefits of adoption. The doctor merely offered that Ca.R. and Ci.R. "would experience additional loss if they separate from their brother . . . ." On this record, the court did not abuse its discretion in finding that appellants had failed to meet their "heavy burden" of proving that the sibling relationship exception to adoption applied. (*Celine R.*, *supra*, 31 Cal.4th at p. 61.)

*Alleged Conflict of Interest*

Appellants claim the court erred in failing to appoint separate counsel for Ca.R., Ci.R., and A.R. because Sanderson had a conflict of interest in representing all three of them. We disagree.

14

"At the outset of dependency proceedings, a court generally appoints a single attorney to represent all the siblings. [Citation.] A court must later relieve counsel from multiple representation of siblings 'if, but only if, there is an actual conflict among the siblings or if circumstances specific to the case . . . present a reasonable likelihood an actual conflict will arise." [Citation.]" (*In re T.C.* (2010) 191 Cal.App.4th 1387, 1390-1391 (*T.C.*).) "For an actual conflict to arise at the permanency planning stage, there must be a showing that the siblings have different interests that would require their attorney to advocate a course of action for one child which has adverse consequences to the other. Standing alone, the fact that siblings have different permanent plans does not necessarily demonstrate an actual conflict of interest. [Citations.]" (*Id.* at p. 1391.)

Assuming that the claim is cognizable in this appeal,[8] appellants may raise it as to Ca.R. and Ci.R. only because the notices of appeal are limited to the court's rulings as to them. (See, e.g., *Dakota Payphone, LLC v. Alcaraz* (2011) 192 Cal.App.4th 493, 504 ["[j]urisdiction of the Court of Appeal is limited in scope to the notice of appeal and the judgment appealed from"].) In other words, appellants cannot claim that A.R.'s interests were adversely affected by Sanderson's representation of his siblings.

In any event, any interests of the children vis-à-vis each other did not create a conflict for Sanderson. Sanderson reasonably determined it was in Ca.R. and Ci.R.'s bests interests to advocate for termination of parental rights and a permanent plan of adoption. The possibility this would be detrimental to their sibling relationship with A.R. did not create an actual conflict of interest requiring the appointment of separate counsel. The sibling relationship exception considers the effects on the children being freed for adoption, not their siblings. (*Celine R.*, *supra*, 31 Cal.4th at p. 54, *T.C.*, *supra*, 191 Cal.App.4th at p. 1392.) In other words, the court could only consider "whether [Ca.R.

---

[8] The issue whether Sanderson had a conflict was argued at a hearing held on June 4, 2015. The court issued its ruling at a hearing held on June 22, 2015, and issued a minute order reflecting its ruling on that same date. The notices of appeal refer only to the October 28, 2015 order denying appellants' section 388 petition as to Ca.R. and Ci.R., the October 28, 2015 order terminating parental rights, and "all other orders made on said dates [*sic*]."

and Ci.R.'s] interest in maintaining the relationship with [A.R.] outweighed [their] interest in the stability and permanence [they] could receive in an adoptive home." (*T.C.*, *supra*, at p. 1392.) Advocating for Ca.R. and Ci.R.'s interest in adoption did not adversely affect A.R.'s interest in permanence and stability.

Moreover, "[t]o the extent there was a 'conflict' between the applicability of the sibling relationship exception to this case and [Ca.R. and Ci.R.'s] interest in the permanence and stability of adoption, it was not a 'conflict of interest' caused by dual representation. Rather, it was 'conflict' arising from the tension between [Ca.R. and Ci.R.'s] competing self-interests. These are the kinds of competing interests that counsel and the courts appropriately deal with in virtually every permanency planning hearing involving siblings. They do not require appointment of separate counsel." (*T.C.*, *supra*, 191 Cal.App.4th at p. 1392.)

Appellants assert that the sibling relationship issue is only "one narrow aspect of Sanderson's conflicted representation for the three children . . . ." According to appellants, "Sanderson already had made clear on June 4 that she had decided to sacrifice [A.R.'s] interests in his relationship with his parents for purposes of furthering her goal of adoption for the two older children . . . ." Appellants further assert that "Sanderson violated the rule of undivided loyalty with her apparent advocacy for the [prospective adoptive] parents. As a result, her representation evolved into the appearance of being a mouthpiece for the [prospective adoptive parents], rather than an independent advocate for each child." These assertions and the remainder of appellants' arguments on the issue merely reflect their disagreements with Sanderson's positions. They do not establish that a conflict of interest required the court to appoint new and separate counsel.

Even if separate counsel should have been appointed, appellants fail to show how it was prejudicial to Ca.R. and Ci.R.'s interests. "A court should set aside a judgment due to error in not appointing separate counsel for a child or relieving conflicted counsel only if it finds a reasonable probability the outcome would have been different but for the error." (*Celine R.*, *supra*, 31 Cal.4th at p. 60.) Contrary to

appellants' claim, the fact Sanderson took a position adverse to HSA's does not render it reasonably probable that different representation would have led to a different result.

## DISPOSITION

The judgment (order terminating parental rights) is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

YEGAN, Acting P. J.

TANGEMAN, J.

Tari L. Cody, Judge

Superior Court County of Ventura

_____


Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant Y.V.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant C.R.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Minors Ca.R. and Ci.R.